# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL JUSTIN ORTEGA,<br><br>    Petitioner,<br><br>    v.<br><br>EVANS, Warden<br><br>    Respondent.             / | 1:08-cv-00894-LJO- DLB (HC)<br><br>FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS<br><br>[Doc. 1] |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## RELEVANT HISTORY

Following a jury trial in the Fresno County Superior Court, Petitioner (along with co-defendants Jesus Lopez and Daniella Dyer) was convicted of first degree murder (count 1; Cal. Pen. Code[1] § 187) of Donald Jamison "DJ" Hunter. The special circumstances that the murder was committed during the commission of robbery, kidnapping, and carjacking (§ 190.2(a)(17)(A), (B), (C)) were found true. It was also found true that Petitioner was armed with a weapon (§ 12022(a)). Petitioner (and the codefendants) was also convicted of robbery (count 2; § 211) while armed with a weapon (§ 12022), and kidnapping (count 3; § 207).

On June 17, 2004, Petitioner was sentenced to life imprisonment without the possibility of parole.

---

[1] All further statutory references are to the California Penal Code unless otherwise indicated.

1

Petitioner filed a timely notice of appeal. On March 12, 2007, the California Court of Appeal, Fifth Appellate District, modified Petitioner's sentence, but affirmed the judgment in all other respects.

The California Supreme Court denied review.

Petitioner filed the instant federal petition for writ of habeas corpus on June 9, 2008. Respondent filed an answer to the petition on March 5, 2009. Petitioner did not file a traverse.

STATEMENT OF FACTS[2]

**FACTS**

On March 21, 2002 19-year-old D.J. left his home in Fowler at approximately 6 p.m. He was driving his 2000 pickup truck. The car had been fixed up, including custom wheels and a stereo system. D.J. spent the evening at the home of his friend Carlos Rodriguez. They watched television, had a couple of drinks and at one point went out to get some food. D.J. had $5 in cash at that time. D.J. left to return home at approximately 1 a.m.

Paul Bedrosian, a friend of D.J.'s, was driving home on March 22, 2002 at approximately 1 a.m. He saw D.J. driving in his truck by himself. He waved to D.J.

**Testimony of Ramiro Roman**

Ramiro Roman agreed to plead guilty to one count of robbery in exchange for his truthful testimony against the defendants.

Roman was living in the back room of his family's home on March 21, 2002. Alfred Cruz came over during the afternoon. They smoked some marijuana together. Over the telephone, Roman spoke to Delores Cruz, his girlfriend and Alfred's sister, at approximately midnight. As Roman left his house to walk over to Delores house, he saw Dyer at the corner of the carport. Dyer asked for Roman. Roman replied that he was Roman. Dyer said that Lopez needed him out front. Roman returned to his room and called Cruz to come out also and see what Lopez wanted.

Lopez was in a truck with Dyer. Roman asked Lopez where he got the truck. Lopez said it was his. Roman did not believe him and again asked him where he got the truck. Lopez responded, "I jacked it." Lopez told Roman that the victim was in the bed of the truck under the truck bed cover, but Roman did not believe him. Roman said he was leaving and he would be back.

Roman met Delores. He told her about the stolen truck and they walked back to his house. When they arrived, Lopez and Dyer were outside by the bed of the truck; Cruz was in Roman's room. Roman told Lopez and Dyer to leave because his mother was home. Lopez said he was waiting for someone and then they would leave. Delores went to the back room.

---

[2] The Court finds the Court of Appeal correctly summarized the facts in its March 12, 2007, opinion, as modified on March 26, 2007, and this Court adopts the factual recitations set forth by the California Court of Appeal, Fifth Appellate District. (Opinion, 2007 WL 738787 at *1-*5.)

Roman looked in the truck. Roman tried to work the hydraulics on the truck. Roman told Lopez that if they were going to be there for a while, he was going to move the truck. Roman moved the truck away from the house. Roman told Lopez and Dyer he was going to take the stereo out of the truck. Lopez did not want Roman to take anything or mess up the truck. Roman went to his room to get tools and gloves to remove the stereo.

Cruz looked through the truck while Roman removed the stereo and amplifiers. Roman took the items to his room and hid them in the basement. Lopez said he was going to come back and get the speakers.

Lopez handed Roman D.J.'s wallet. Roman looked through it and threw identification and other papers into a barrel. During the course of the evening several of those present used Roman's portable home phone.

Roman asked Lopez where the other people were, since it had been one or two hours since Lopez arrived at Roman's house. The others arrived in a light blue van. Those in the van included Martin Castro, Jose Romero, defendant Ortega and one other person.[3]

The group left with Dyer, Ortega, and the unidentified person in the truck. The others followed in the van. Roman and Cruz stayed at Roman's house.

Lopez called at approximately 6 a.m. that morning. Roman asked him what happened to the owner of the truck. Lopez said he "ate dirt." Lopez came over a couple of days later to get the stereo speakers. Lopez did not know that Roman had switched the stolen speakers with cheaper speakers. Roman kept the stolen speakers for himself. Roman burned the items he had removed from D.J.'s wallet.

**Testimony of Alfred Cruz**

While being tried in a separate and earlier proceeding for the murder of D.J., Cruz agreed to plead guilty to one count of robbery in exchange for his truthful testimony against the remaining defendants.

Cruz was at Roman's house watching television on March 21, 2002. Roman left sometime around midnight to get Delores. Roman came back about 45 minutes later and then left again. Roman said there was someone outside. Lopez and a female, Dyer, were outside in a nice truck. Cruz asked Lopez where he got the truck and Lopez said he "jacked it." The keys were in the ignition. Lopez asked to use the telephone to call Martin Castro. Lopez told Castro to come to Roman's.

Lopez told Cruz that the victim tried to rape Dyer so they beat him up and threw him in the back of the truck. Lopez told Cruz to talk to D.J.

Roman moved the truck to the side of the house. Roman said he was going to take the stereo out of the truck. Lopez did not want Roman to do so, but Roman did it in any event. Lopez wanted everything in the truck because his "homies" were going to come.

---

[3] Castro and Romero were convicted of the first degree murder of D.J. in a separate trial. Their convictions have been affirmed on appeal.

3

They got tools and removed items from the truck. Dyer was talking to D.J. and asked him for his cell phone number. Cruz saw Dyer talking on the phone. Lopez told Cruz to ask D.J. for his wallet. Cruz did and D.J. threw the wallet out from under the truck bed cover. Cruz handed items from the wallet to Roman. There was no money in the wallet. Lopez asked D.J. for money but he said he did not have any. Lopez told D.J. to throw the money out or they were going to kill him. D.J. was moaning and asking why. Roman threw items from the wallet into a barrel.

A light blue van pulled up to Roman's house. Ortega was in the van. Ortega handed a gun to Dyer. Lopez told Cruz they were going to tie up D.J. and throw him in a field. Dyer got into the truck with the gun. Lopez later said they were going to kill D.J.

Ortega drove off in the truck with Dyer sitting in the middle and one other man in the truck. Lopez drove the van, with others inside. They left about 3:45 a.m.

In the afternoon Lopez called and said "they had to do him." Lopez said that D.J. knew too much.

## Evidence from Nonaccomplice Witnesses

Juan Hernandez was driving to work about 5 a.m. when he saw a light van followed by a nice truck. At approximately 5:30 a.m. Harry Stackhouse heard gunshots. Within a minute of hearing the gunshots, he saw a blue van speeding away. He then saw smoke. Another neighbor heard gunshots and called 911.

Deputy Sheriff David Cunha was dispatched at 5:53 a.m. to a call of gunshots and smoke. He arrived at 6:01 a.m. to find D.J.'s truck engulfed in flames. The fire department arrived quickly and put out the fire. After the fire was extinguished the cover over the bed of the truck collapsed and Cunha could see a burned human body. He requested additional units. Three of the custom tires on the truck were missing. One tire that had a bent lug nut remained.

An investigation revealed that flammable liquids had been used to accelerate the fire. D.J. died from three gunshot wounds to the head. Two projectiles were recovered from his body. He had very significant burns to his body, but no soot or carbon in his airway. There was hemorrhage along the gunshot wounds indicating that D.J. was alive when all three shots were fired, but was dead before his body was burned. The projectiles recovered from D.J.'s body were fired from the same firearm.

On the morning of March 22, 2002, Beau Vang arrived at his business. Inside the fenced parking lot he found a cell phone. He thought the phone might have been dropped by one of his customers. He brought the phone inside and answered it when one of D.J.'s friends called looking for D.J. The friend relayed the information to D.J.'s mother, and she told law enforcement. Law enforcement went to Vang's place of business and retrieved the phone. The phone belonged to D.J.

Cell phone records from D.J.'s phone were retrieved. Beginning approximately 1:27 a.m. on March 22, 2002 and ending at 4:16 a.m. a number of phone calls were made to and from D.J.'s cell phone. The first call was from D.J.'s phone to Ortega's pager. Calls were made to Lopez's pager, Roman's phone and Dyer's apartment. Calls were received from various places including several calls from

4

Lopez's home to the cell phone.

Augustina Lopez, defendant Lopez's sister, testified that Lopez lived in the same house as she did. Martin Castro, her nephew and previously convicted codefendant, also lived there. She testified that her phone rang a lot during the night of March 21, 2002. Dyer was calling and asking for Ortega. Lopez was not there when Dyer called. Ortega showed up at the house between 2 and 3 a.m. and used the phone. (Three calls were made from the Lopez home to D.J.'s cell phone, at 2:17 a.m., 2:18 a.m. and 4:14 a.m.) Augustina testified that numerous calls were received between midnight and 5 a.m.

Fresno County Sheriff's officers had stopped a blue van owned by Gabriel Rojas on March 21, 2002. The driver was Ortega; Dyer was the passenger. The same van was stopped on March 22, 2002. Rojas was the driver and Ortega was a passenger.

Based on the telephone records and other evidence, several search warrants were issued and several defendants were arrested and/or detained. Speakers matching the speakers stolen from D.J.'s vehicle were found in the basement of Roman's house.

Officers searched a van on the property where Castro and defendant Lopez lived. They found shell casings and live rounds in the van with bunter marks that matched the casings found at the crime scene. An average bunter makes 100,000 casings.

**Statements and Recorded Conversations from the Defendants**

Dyer was detained and questioned. She admitted that she had been in the blue van and she said that she knew who D.J. was. She initially told law enforcement that on the night of D.J.'s murder she was at home taking care of her children. After further questioning, she stated that she left her home at approximately midnight with a man who called himself Adam and a woman named Laurie. D.J. was following them. Adam told Dyer to get out and ask D.J. if he wanted to party with them. She did so, and D.J. declined the invitation. Adam then took off, leaving Dyer at D.J.'s truck. Dyer asked D.J. for a ride, and they tried to catch up to Laurie and Adam. They stopped by a house, and Adam and a person from the house came out and started hitting D.J., forcing him into the back of his truck. Adam, the other person and Dyer got into the cab of the truck and drove off. Dyer said she wanted to go home. They took her home and told her to keep her mouth shut. Dyer denied being present when the truck was stripped or having anything to do with the killing.

Ortega was questioned by police. He said he did not know anything about the murder of D.J. He said that he spent the early morning hours of March 22, 2002 in Dinuba stealing car radios. He was in the blue van when he stole the radios. After stealing the radios he went to his brother's house and did not go out again.

Ortega and Dyer were placed in adjoining holding cells after they were questioned by police. They professed their love for each other. Ortega asked Dyer to not break down on him. Dyer responded she would not break down. Ortega told Dyer that she knew it was not her, and she does not know anything. He advised her not to add to the story. Dyer said she wanted to marry Ortega. Ortega assured Dyer he was going to marry her.

Lopez was questioned by police. He said he did not kill anyone. He was home, went a few places, and then returned home on the night/morning in question. He

5

said that a truck was at his house a few minutes but he did not even talk to the person in the truck. Another truck pulled up with it and a few people got out of the second truck. Lopez said he believed the truck got "jacked" somewhere and then taken to his house. Lopez left with a couple of females. Then he came home and called it a night. Officers pressed Lopez for the name of a female involved. He did not give a name. He said a girl came to his house with D.J. and they wanted some weed. Lopez did not think the guy had been carjacked because he was with the girl that came to his house. Lopez and the girl took off and went looking for weed. They went to a friend's house on the west side; Lopez said he came back with someone else. Lopez thought the girl wanted to use D.J. to get high and use his truck to cruise around in.

Lopez called his sister from jail. During their conversation, Lopez said that the guy (D.J.) came to his house with a girl. He informed his sister that he told officers he left with them and they were trying to get some weed. Lopez told his sister they went to Roman's house and D.J. was in the other truck cruising around. At that time the girl said forget the guy, "let's just get his beat [stereo]." Lopez said they took out his stereo. Others arrived in another truck and Lopez went home.

DISCUSSION

A. Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises out of the Fresno County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. § 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct. 1114 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

///

1  B.     Standard of Review

2       Where a petitioner files his federal habeas petition after the effective date of the Anti-
3  Terrorism and Effective Death Penalty Act ("AEDPA"), he can prevail only if he can show that
4  the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court decision is "contrary to" federal law if it "applies a rule that contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are materially indistinguishable from" a Supreme Court case, yet reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) citing Williams (Terry) v. Taylor, 529 U.S. 362, 405-06 (2000). A state court decision will involve an "unreasonable application of" federal law only if it is "objectively unreasonable." Id., quoting Williams, 529 U.S. at 409-10; Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002) (*per curiam*). "A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Lockyer, at 1175 (citations omitted). "Rather, that application must be objectively unreasonable." Id. (citations omitted).

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). Both subsections (d)(2) and (e)(1) of § 2254 apply to findings of historical or pure fact, not mixed questions of fact and law. See Lambert v. Blodgett, 393 F.3d 943, 976-77 (2004).

Courts further review the last reasoned state court opinion. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991). However, where the state court decided an issue on the merits but provided no reasoned decision, courts conduct "an independent review of the record . . . to

1 determine whether the state court [was objectively unreasonable] in its application of controlling

2 federal law." Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000). "[A]lthough we

3 independently review the record, we still defer to the state court's ultimate decisions." *Pirtle v.*

4 *Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

C.  Instructional Error

Petitioner contends that the trial court erred by denying his request for a pinpoint jury instruction defining accessory after the fact.

As fully explained by the California Court of Appeal this claim is without merit:

> Dyer and Ortega requested the court to instruct the jury on accessory after the fact pursuant to CALJIC No. 6.40. Their request was based on two theories. First, they wished to have the instruction given as a lesser related instruction. Next, they wanted the instruction given as a pinpoint defense instruction. The trial court refused to give an instruction on accessory after the fact.
>
> CALJIC No. 6.40 provides: "Defendant is accused [in Count[s] ____] of having committed the crime of being an accessory to a felony in violation of section 32 of the Penal Code.
>
> "Every person who, after a felony has been committed, harbors, conceals or aids a principal in that felony, with the specific intent that the principal may avoid or escape from arrest, trial, conviction or punishment, having knowledge that the principal has committed that felony or has been charged with that felony or convicted thereof, is guilty of the crime of accessory to a felony in violation of Penal Code section 32.
>
> "In order to prove this crime, each of the following elements must be proved:
>
> "1. A felony, namely _____, was committed;
>
> "2. Defendant harbored, concealed or aided a principal in that felony with the specific intent that the principal avoid or escape [arrest] [trial] [conviction or punishment]; and
>
> "3. Defendant did so with knowledge that the principal [committed the felony] [was charged with having committed the felony] [was convicted of having committed the felony]."
>
> Dyer asserts that she was entitled to the instruction. She claims that the evidence that supports the accessory instruction is that she tried to divert attention from herself and the other charged defendants in her statement to police, thus aiding the other defendants in escaping conviction.
>
> Accessory after the fact is a lesser related offense to murder. "[A] trial court has no duty to instruct on an uncharged lesser related offense when requested to do so by the defendant [citation]." (*People v. Schmeck* (2005) 37 Cal.4th 240, 292, 33 Cal.Rptr.3d 397, 118 P.3d 451.) We are bound by this decision of the California Supreme Court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450,

8

455, 20 Cal.Rptr. 321, 369 P.2d 937.)

Dyer argues that even if she is not entitled to a lesser related offense instruction she is entitled to an instruction that pinpoints her defense when such an instruction was requested. A trial court is required to give pinpoint instruction upon request if the instruction is supported by substantial evidence. (*People v. Bolden* (2002) 29 Cal.4th 515, 558, 127 Cal.Rptr.2d 802, 58 P.3d 931.)

"A person may aid, or attempt to aid, the principal to a crime by making false or misleading statements to the authorities, and such conduct will support a conviction of accessory after the fact." (*In re I.M.* (2005) 125 Cal.App.4th 1195, 1203, 23 Cal.Rptr.3d 375.) In *In re I.M.*, the defendant was found to be an accessory after the fact based on several things, including telling the police a false story about what he had seen in an effort to mitigate the evidence against the shooter, a fellow gang member. (*Ibid.*) In *People v. Duty* (1969) 269 Cal.App.2d 97, 74 Cal.Rptr. 606 the defendant was found guilty of being an accessory after he supplied an affirmative and deliberate falsehood in the form of a false alibi for the principal to the public authorities.

In her statement to police, Dyer did not affirmatively misrepresent the activities of her codefendants; her statement at most would be considered to be withholding information regarding activities. A mere withholding of information is not equivalent to supplying affirmative and deliberate falsehoods regarding the activities of others and cannot be considered evidence sufficient to support a conviction for accessory after the fact. Because the evidence would not support such a conviction or such a defense the trial court did not err in failing to give the pinpoint defense instruction.

Ortega raises the same issue on the same basis as Dyer. His argument should be rejected on this point. In addition, Ortega argues there was evidence that his involvement in the crime amounted only to attempting to dissuade witnesses after Dyer was arrested, thus he was an accessory after the fact.

Even if we assume that the evidence would support an argument that Ortega aided Dyer by attempting to dissuade witnesses after the fact, error in failing to give an accessory instruction was harmless beyond a reasonable doubt. First, Ortega was allowed to argue this theory to the jury-thus the jury was aware of the theory. More importantly, we cannot imagine that jurors would convict Ortega of first degree murder with special circumstances if they believed that he was only involved in witness intimidation after the fact. (*People v. Turner* (1990) 50 Cal.3d 668, 692-693, 268 Cal.Rptr. 706, 789 P.2d 887, *People v. Boyer* (2006) 38 Cal.4th 412, 471, 42 Cal.Rptr.3d 677, 133 P.3d 581.)

(Opinion, 2007 WL 738787 at *12-*14.)

There is no constitutional right to an instruction based on lesser related offenses that are not lesser included offenses under state law. Hopkins v. Reeves, 524 U.S. 88, 96-98 (1998) ("Almost all States . . . provide instructions only on those offenses that have been deemed to constitute lesser included offenses of the charged crime. We have never suggested that the Constitution requires anything more.") (citations omitted). Under California law, being an accessory to murder is not a lesser included offense of murder. People v. Majors, 18 Cal.4th 385,

9

408 (1998); People v. Preston, 9 Cal.3d 308, 319-320 (1973). There being no constitutional right to instruction based on lesser related offenses, it cannot be said that the state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. 28 U.S.C. § 2254(d)(1).

Moreover, Petitioner's claim that the accessory after the fact instruction (CALJIC 6.40) supported his theory of defense, it likewise is without merit. A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in a federal habeas corpus action. See Estelle v. McGuire, 502 U.S. 62, 71-72 (1991). To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the failure to given an instruction so infected the entire trial that the resulting conviction violates due process. Id. at 72; see also Dunckhurst v. Deeds, 859 F.2d 110, 114 (9th Cir. 1988). The failure to instruct on a theory of defense rises to the level of a due process violation only if "the theory is legally sound and evidence in the case makes it applicable." Clark v. Brown, 450 F.3d 898, 904-905 (9th Cir. 2006) (internal quotation omitted). A petitioner's burden is especially heavy when a claim is based on the omission of an instruction because no erroneous instruction was given. Henderson v. Kibbe, 431 U.S. 145, 155 (1977). An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law. Id. The significance of the omitted instruction is evaluated by a comparison with the instructions that were given. Id. at 156; Murtishaw v. Woodford, 255 F.3d 926, 971 (9th Cir.2001). Moreover, the denial of a theory of defense instruction is not error when the instructions given adequately encompassed the theory of the defense. United States v. Duran, 59 F.3d 938, 941 (9th Cir. 1995).

In this instance, the California Court of Appeal reasonably found that Petitioner was not precluded from presenting his theory that he was not guilty of first degree murder because he did not have any direct involvement and his only conduct occurred after the commission of the offense. Accordingly, because being an "accessory after the fact" was not a lesser included offense, nor was it a charged offense, and because Petitioner thoroughly argued his theory of defense to the jury, the state appellate court's decision that there was no error in failing to give the requested instruction was not contrary to, or an unreasonable application of clearly

established federal law, nor was it an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(1), (2).

D. <u>Admission of Codefendant Roman's Statements</u>

Petitioner contends that the trial court erred by failing to exclude co-defendant Romero Roman's testimony at trial.

The California Court of Appeal denied Petitioner's claim stating:

> Roman and Lopez were arrested on March 26, 2002. On March 28, 2002, private attorney Mario DiSalvo became Roman's attorney. Roman and Lopez were arraigned together. Lopez was represented by the public defender's office.
>
> The court conducted a lengthy hearing based on DiSalvo's visiting Dyer's parents and Dyer, and visiting Lopez in jail when he was already representing Roman. The question regarding the inappropriateness of DiSalvo's visit to Dyer's parents and to Dyer is not raised on appeal.
>
> Lopez claimed that the trial court should have precluded Roman (DiSalvo's actual client) from testifying at trial based on DiSalvo's visits to Lopez and conversations with him after DiSalvo was representing Roman and Lopez was represented by counsel. He argued that DiSalvo was able to influence Roman's testimony and provide him with information directly from Lopez about the crime.
>
> It was established at the hearing that DiSalvo did visit Lopez in jail and had a conversation with him. He also conversed with him in the courtroom on more than one occasion. DiSalvo claimed he went to see Lopez because Lopez wanted a new attorney. DiSalvo claimed he went there to tell Lopez the name of an attorney who could represent him. DiSalvo claimed he did not have conversations with Lopez regarding the substance of the case.
>
> Lopez testified that DiSalvo approached him and said he wanted to help him out. DiSalvo told Lopez that he could not represent Lopez, but Lopez could hire an attorney he recommended. DiSalvo asked for Lopez's side of the story, Lopez told him some things.
>
> Without determining the degree of impropriety that occurred when DiSalvo visited Lopez, the court denied the request to preclude Roman from testifying. It found that there was no attorney-client relationship between Lopez and DiSalvo and that their conversations were not protected by the privilege. The court noted that the prosecution had no part in these contacts. The court found that even if it found an attorney-client relationship there was no evidence to show that Roman's statements were derived from any information obtained by DiSalvo from Lopez.
>
> Lopez now claims the trial court erred when it allowed Roman to testify. He argues that allowing Roman to testify denied him his right to due process and his right to counsel. Lopez claims the error was prejudicial because absent Roman's testimony the record is much less clear as to whether Lopez carjacked D.J.'s truck and by extension kidnapped D.J.
>
> We agree with respondent that error, if any, in failing to exclude Roman's

testimony was harmless.[4] Cruz's testimony was not "garbled" as Lopez contends. Roman and Cruz's testimony differed in very few respects. Lopez admitted he was with D.J. on the night in question and in a conversation with his sister said he took D.J.'s stereo. Thus Lopez was clearly involved in the events on the night in question. Roman's testimony added little to the evidence against Lopez. In addition, Lopez was allowed to present evidence to the jury detailing DiSalvo's behavior and calling into question Roman's testimony.

(Opinion, 2007 WL 738787 at *17-*18.)

Generally, the admissibility of evidence is a matter of state law, and is not reviewable in a federal habeas corpus proceeding. Estelle, 112 S.Ct. at 477; Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir.), *cert. denied,* 478 U.S. 1021 (1985). Nevertheless, there can be habeas relief for the admission of prejudicial evidence if the admission was fundamentally unfair and resulted in a denial of due process. Estelle, 112 S.Ct. at 482; Pulley v. Harris, 465 U.S. 37, 41, 104 S.Ct. 871, 874 (1984); Walters v. Maas, 45 F.3d 1355, 1357 (9th Cir. 1995); Jeffries v. Blodgett, 5 F.3d 1180, 1192 (9th Cir. 1993), *cert. denied*, 510 U.S. 1191, 114 S.Ct. 1294 (1994); Gordon v. Duran, 895 F.2d 610, 613 (9th Cir.1990). Only if there are no permissible inferences that the jury may draw from the evidence can its admission rise to the level of a due process violation. Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991).

As an initial matter, there is no clearly established Supreme Court authority which prohibits testimony by a witness on the ground that it was somehow tainted by misconduct on the part of a private actor rather than the government and any relief is foreclosed under § 2254(d). Furthermore, even if there was misconduct on the part of Romans's counsel (DiSalva), such misconduct did not render Roman's testimony untruthful or prejudicial. See e.g. Colorado v. Connelly, 479 U.S. 157, 166-167 ("The most outrageous behavior by a private party seeking to secure evidence against a defendant does not make that evidence inadmissible under the Due Process Clause . . . . The purpose of excluding evidence seized in violation of the Constitution is to substantially deter future violations of the Constitution."); Brecht v. Abrahamson, 507 U.S.

---

[4] We also agree with respondent's position that by repudiating Lopez's argument we in no way defend the behavior of DiSalvo.

12

619 (1993).

As an initial matter, Petitioner's claim is based on the fact that DiSalvo communicated with co-defendant Lopez (who was represented by counsel) even though he represented co-defendant Roman, and that such action tainted Roman's testimony making it inadmissible. It was specifically alleged that DiSalvo somehow "coached" Roman to identify co-defendant Dyer as the female participant in the crime, and such identification prejudiced Petitioner because of his close relationship with Dyer. As fully explained by the California Court of Appeal, Roman's testimony was for the most part cumulative to the testimony provided by Cruz and differed in very few respects, and there was simply no prejudice by Roman's testimony. Cruz testified that Petitioner arrived at Roman's residence armed with a semi-automatic handgun, stating "were going to kill this mother fucker [referring to the victim]", and drove the victim's truck away from the residence. (RT 5760, 5770, 571-5772.) Thus, any testimony by Roman was simply cumulative. In addition, there was no showing that DiSalvo obtained any information from Lopez, much less disclosed such information to Roman, such that his testimony was somehow tainted. Moreover, the jury was fully aware of DiSalvo's actions, and the parties argued that Roman's testimony was questionable. (See e.g. RT 9304-9306.) Accordingly, the state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor an unreasonable determination of the facts in light of evidence before it. 28 U.S.C. § 2254(d)(1), (2).

## RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that:

1. The instant petition for writ of habeas corpus is DENIED; and,

2. The Clerk of Court is directed to enter judgment in favor of Respondent.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to

1 | Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served
2 | and filed within ten (10) <u>court</u> days (plus three days if served by mail) after service of the
3 | objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. §
4 | 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time
5 | may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th
6 | Cir. 1991).

IT IS SO ORDERED.

Dated: **April 22, 2009**       /s/ **Dennis L. Beck**
                                                                  UNITED STATES MAGISTRATE JUDGE